NOT DESIGNATED FOR PUBLICATION

No. 121,364

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of K.H., Z.H., AND L.H., Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court, GREGORY D. KEITH, judge. Opinion filed May 29, 2020. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before STANDRIDGE, P.J., LEBEN AND BRUNS, JJ.

PER CURIAM: Mother, A.H., appeals from the district court's order terminating her parental rights to three children. Such rights may be terminated only in circumstances set out by statute and only when clear and convincing evidence supports the termination. See K.S.A. 2019 Supp. 38-2269.

Mother contends on appeal that the evidence wasn't enough for the district court to terminate her parental rights and that no reasonable person could conclude that terminating her rights was in the children's best interests. But termination is authorized when a parent has shown a lack of effort to adjust his or her circumstances, conduct, and condition to meet the children's needs, K.S.A. 2019 Supp. 38-2269(b)(8); when reasonable efforts by public and private agencies to get the family back together have failed, K.S.A. 2019 Supp. 38-2269(b)(7); and when a parent fails to carry out a reasonable court-approved plan aimed at reintegrating the family, K.S.A. 2019 Supp. 38-2269(c)(3).

Here, when the district court terminated Mother's parental rights, the children had been in State custody (placed in foster homes) for 32 months—30 of those after the children had been legally declared "children in need of care" under K.S.A. 2019 Supp. 38-2202(d), a finding Mother did not contest. Despite that, Mother denied that her conduct needed to change to get the family back together, she was habitually late to weekly visitations, and she did not work to foster a good relationship with her children. And although the family had received extensive services from social-services agencies, Mother failed to follow through with family therapy, individual therapy, or substance-abuse treatment, as the family's case plan required.

We recognize that termination of parental rights is a serious matter. We have reviewed the entire record, and we find clear and convincing evidence to support the district court's findings that Mother was unfit as a parent and that the conditions leading to that finding were unlikely to change in the foreseeable future. We also find that a reasonable person could agree with the district court that terminating Mother's parental rights was in the children's best interests. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Cases like these are necessarily fact-driven, so the factual background must be described in some detail. Mother has three sons: K.H. (born 2008), Z.H. (born 2009), and L.H. (born 2011). K.H. and Z.H. have autism. The three boys have the same father, C.H., who died during these proceedings.

The Kansas Department for Children and Families first received reports about the family in 2012. Those reports concerned the parents' mental health and the children's education. Between November 2014 and November 2015, the department received 10

2

reports of abuse or neglect of the boys, including a report that Father had attempted suicide in the family home in October 2015 while the children were in the home. The department also learned that the family had been investigated in Florida before moving to Kansas.

By early December 2015, all three children had been placed in temporary State custody. The parents did not contest the State's allegation that the three boys were children in need of care under Kansas law, and the district court adjudicated them as such under K.S.A. 2019 Supp. 38-2202(d)(1) (lacking adequate parental care), (d)(2) (lacking care or control necessary for child's physical, mental, or emotional needs), and, for K.H., (d)(8) (child committed an act which if done by an adult would be a felony or misdemeanor). The finding that the boys were children in need of care—which happened in February 2016—is not at issue on appeal.

There is not much in the record before us about the first six months of 2016, but it appears that the children were close to being reintegrated—by July, they were spending five days of the week at home. But a turning point happened in July 2016, when Mother and Father were in a severe car accident. Father died instantly; Mother was hospitalized for several months.

After Mother was released from the hospital, the district court began holding periodic hearings about how to proceed toward reintegration. Each time, the court ordered the boys remain in State custody. Before each hearing, caseworkers at a social-service agency, Saint Francis Community Services, prepared progress reports. Those reports describe the events that prompted the State's motion.

In November 2016, Pheasant Weber, a Saint Francis caseworker, reported that Mother was argumentative and uncooperative during her initial parenting assessment; Mother also failed to appreciate that different parenting techniques were appropriate for

3

children with autism. Weber noted that Saint Francis had struggled to work with Mother: Mother refused to get a required mental-health evaluation, she struggled to set a consistent structure or routine in the home, she refused to allow two of her children to receive educational testing, and she was not appropriately addressing her children's behavioral issues. Weber also said that school staff and therapists had raised concerns about the children's unsupervised visits with Mother, saying the children had returned dressed inappropriately, dirty, hungry, or overly tired. After this report, the district court ordered Mother to engage in both individual therapy and family therapy with the boys.

In January 2017, Weber reported that little progress had been made and that her working relationship with Mother was strained (the case was later transferred to another caseworker). Weber said that Mother had refused to sign a plan outlining steps that she needed to take to regain custody of her boys. Mother remained confrontational and uncooperative, according to the report, and had told her children not to talk to Saint Francis about visits at Mother's house. The report also said that Mother struggled to parent her children during visits, spending most of the time on her cell phone and failing to address her children's aggressive behavior.

A different Saint Francis caseworker, Alyssa McCarroll, took over Mother's case the next month. Her initial assessment was that Mother's lack of transparency and her inability to accept guidance was a barrier to reintegration. She worked with Mother to develop a new plan to help make sure the children would have a safe and appropriate home to return to. Tasks on that plan included beginning individual therapy and family therapy with her children; allowing periodic walk-throughs of her home; providing financial information; and not encouraging her children to behave poorly. Mother signed the plan, acknowledging that failing to complete the tasks could lead to continued out-of-home placement or the termination of parental rights.

4

McCarroll did not note significant progress when she updated the district court in June 2017. She said that Mother continued to resist guidance in parenting her children and addressing mental health issues—for example, Mother hadn't followed through with family therapy. McCarroll also said Mother continued to be inconsistent with keeping appointments and following through with the various professionals involved. This report also noted that Mother had recently become engaged to J.P., a man who had been living in her house. Mother had posted on Facebook that he'd recently been using methamphetamine while they were temporarily estranged. The district court entered additional orders after this report. The court ordered J.P. to comply with the tasks in the case plan, and it reiterated that Mother needed to go to family therapy with her children. It also had Mother and J.P. submit to a urinalysis and hair-follicle test to screen for narcotics; both tested positive.

For a time, things appeared to turn in the right direction for Mother after those court orders. McCarroll's August 2017 report said that Mother was fixing up her house for the boys' return and that Mother had been more cooperative and was making progress on changes in her life. McCarroll concluded that Mother was adequately completing her assigned court orders, thanks in part to substantial effort by Saint Francis staff. After that report, the court ordered Mother to begin individual therapy again; apparently, she had stopped that at some point.

Mother's progress did not continue. After Mother and J.P. both tested positive for drugs more than once, the district court entered new orders in November 2017. The court ordered both to comply with drug-testing requests, obtain a substance-abuse evaluation, and follow any recommendations in it. The court also reiterated that Mother needed to start individual therapy and that Mother and J.P. needed to start couples' therapy. Mother did get a substance-abuse evaluation in early December 2017—testing positive for methamphetamine in the process—but she didn't follow the evaluation's recommendation of outpatient therapy.

McCarroll reported in January 2018 that Mother continued to regress. She said that Mother's behavior toward caseworkers had returned to being secretive and explosive. McCarroll also addressed two other concerns. First, Mother and J.P. had been involved in a domestic-violence situation, with each party alleging that the other was the aggressor. And second, McCarroll said that Saint Francis had learned that Mother had been using drugs throughout the case. Our record shows that Mother had tested positive for various narcotics 10 times between April 2017 and February 2018, which is when the State moved to terminate her parental rights.

In January 2018, workers involved in Mother's case met to determine whether to stick with the goal of reintegration, which had been their recommendation until that time. They concluded that it was time to change course and recommend adoption instead of reintegration. Concerns noted during that meeting included the poor condition of the home; Mother's continued drug use and failure to submit to drug tests; and the domestic-violence situation between Mother and J.P. McCarroll's final report in February 2018 said that little progress had been made in the case; McCarroll said that Mother was not being transparent and that she had refused to follow a court order that she sign a release of information relating to the July 2016 car accident that killed the boys' father.

In February 2018, the State moved to terminate Mother's parental rights. The district court held a trial during which Mother, McCarroll, J.P., and other individuals involved with the case testified. The trial was apparently originally expected to take one day but ended up taking two—one in June and one in August 2018. We've organized the relevant testimony by topic.

*Inconsistency during visitations*

McCarroll testified about Mother's inconsistency during visits with her children. She said at the first day of the trial that Mother has missed two of her scheduled visitations with her children, rescheduled or sought to reschedule a couple visits, and been late to almost all her visitations. At the second day of trial, McCarroll said that Mother had been consistently 15, 20, or 30 minutes late to her weekly, hour-long visitations. McCaroll said that Mother's inconsistency was a huge concern. If Mother couldn't make it to appointments herself, McCarroll asked, how would Mother make sure that her special-needs children got to therapy, treatment, and doctor's appointments?

*Lack of secondary changes*

McCarroll said that Mother had not made "secondary changes," which McCarroll said meant taking responsibility and acknowledging that something is wrong, then changing those aspects of your life. She said that there had been little secondary change over the 30 months that the case had been open. She said that Mother did not accept responsibility, still believed that her actions had not been wrong, and said that it was Saint Francis' fault that she did not have her children back.

When Mother took the stand, she said that she had heard the concerns raised by Saint Francis workers, but that their concerns were just their opinions. Mother said that there was no reason that the kids should not be at home with her. She also said that Saint Francis had not provided enough support and that Saint Francis and its staff, not Mother, needed to change. She also accused the Saint Francis caseworkers of lying.

*Failure to complete family therapy*

McCarroll testified about Mother's failure to complete family therapy. She said that Saint Francis had originally recommended family therapy because staff members were concerned about Mother inappropriately discussing the case during visitation and the lack of bonding between the children and Mother. A Saint Francis clinician did a six-session evaluation with Mother and the children and recommended the family participate in a type of family therapy involving in-the-home parenting training. McCarroll said she thought that would benefit Mother because Mother had struggled to parent her children appropriately, especially her special-needs children. She said Mother continually gave in to anything the kids requested.

McCarroll said she told Mother that Mother would need to contact the clinician to set up the in-home training visits. McCarroll said Mother did not want to do the therapy. McCarroll said that Mother needed to meet with the clinician to fill out forms, but that Mother failed to show up for three or four meetings. After Mother said she that did not trust the clinician, McCarroll said she offered three other clinicians, but Mother was not willing to use them. McCarroll said that she discussed family therapy again in an email conversation with Mother's attorney in May 2018 (one month before the first day of trial). McCarroll reiterated that Mother needed to complete family therapy. McCarroll said that she contacted the Saint Francis clinical director, but they said there was a six-week waiting period and they didn't want to fill the waiting list with somebody who had failed to comply.

Mother testified that she did not refuse to do family therapy. She said that she had signed the paperwork but that the family therapy never started because the Saint Francis clinician would not return her texts to schedule a meeting.

*Failure to complete individual therapy*

According to McCarroll and Connie Mayes, Mother's therapist, Mother also failed to complete individual therapy. McCarroll testified that Mother had done a psychological evaluation and a parenting assessment, both of which had recommended individual therapy. McCarroll said that when she took over the case in January 2017—more than a year after the State assumed custody of the children—Mother had not done the individual therapy.

McCarroll said she made another referral in November 2017 to Connie Mayes and that Mother did an intake and started attending individual therapy. McCarroll said that Mother consistently attended from at least December 2017 to February 2018, but then she missed the entire month of May 2018. Mayes testified that Mother started doing individual therapy in November 2017. She said they tried to schedule twice a week, which sometimes worked, but that there were gaps when Mother wouldn't come. Of the times that Mother missed, about half of them were cancellations and half were no-shows. Mayes also said that in between the two trial dates, Mother had attended four appointments and no-showed to five.

*Failure to get substance-abuse treatment*

Mother testified about getting a substance-abuse assessment and treatment. She said that her first substance-abuse evaluation recommended outpatient treatment. She said that she was admitted into an outpatient program called Seventh Direction but that she stopped going after a week. Mother also said that she tried intensive outpatient therapy but only for a couple of weeks. After that, Mother said, she had done no substance-abuse counseling although her therapist had recommended it. Mother said she knew that getting a substance-abuse evaluation was a top priority after the first day of trial in June 2018,

9

but she hadn't done it by the second day of trial (held in August). Mother said that she still planned on doing it.

Lorna Stoecklein, a substance-abuse counselor, also testified about Mother's substance-abuse treatment. Stoecklein said that she met with Mother in April 2018 after Connie Mayes referred Mother. Stoecklein said she recommended inpatient treatment, but that Mother thought that would be too intense. Stoecklein said she also suggested intensive outpatient therapy but that Mother thought that would cause her to miss visitations. She said that they agreed to do sessions twice a week. At time of the second day of trial in August, Stoecklein said that she had not had another session with Mother after the one in early June. She said Mother had not followed up on recommendations for outpatient treatment, inpatient treatment, or a 12-step program.

*Saint Francis' efforts*

McCarroll discussed the amount of effort she had expended on Mother's case. McCarroll said she was there around the clock for Mother. She said that if Mother called at 10 p.m., McCarroll would answer, and that if Mother contacted her at 2 a.m., McCarroll would return the call at 5:30 a.m. when she woke up. McCarroll said she had made many referrals for Mother and would remind Mom to call people and follow up. McCarroll said she had communicated with Mother four or five times per week. She also said she had put in a lot of time on this case and tried to use all available resources. McCarroll said that this one case had overwhelmed all her other cases.

*Lack of progress between hearings*

Finally, McCarroll testified about the lack of progress that Mother had made between the two days of trial. McCarroll said that before the first day in June, she had emailed Mother's attorney about ongoing concerns with the case. She said that she had

raised these issues with the attorney: (1) Mother had not provided reliable income information; (2) Mother had provided six addresses; (3) Mother was not following through with drug testing; (4) Mother needed to do family therapy; (5) Mother needed to be involved in her children's education; (6) Mother needed to get treatment; (7) Mother needed to better manage her schedule; (8) Mother's communications were not always accurate and consistent; and (9) Mother needed to encourage a relationship with her children. McCarroll said she told Mother that it was fundamentally necessary to address these problems. But McCarroll said she didn't feel like there was any progress on these by the time the trial concluded in August. McCarroll said she didn't believe that Mom was a fit parent.

After hearing all the evidence, the district court agreed and found that Mother was an unfit parent. The court found that Mother was unfit because mental illness had rendered her unable to care for the ongoing needs of her children, K.S.A. 2019 Supp. 38-2269(b)(1); because her use of narcotics rendered her unable to meet the ongoing needs of her children, K.S.A. 2019 Supp. 38-2269(b)(3); because reasonable efforts by appropriate agencies had been unable to rehabilitate the family, K.S.A. 2019 Supp. 38-2269(b)(7); because Mother had not made sufficient effort to adjust her circumstances to meet the needs of the children, K.S.A. 2019 Supp. 38-2269(b)(8); and because Mother had failed to carry out a reasonable plan approved by the court directed toward the reintegration of children into Mother's home, K.S.A. 2019 Supp. 38-2269(c)(3).

The district court also concluded that these conditions were unlikely to change in the foreseeable future. It noted Mother's regression since the previous fall and emphasized that Mother had used methamphetamine just weeks before the trial began. The court also noted that Mother had had 60 days between the two trial dates to get a substance-abuse evaluation and submit to drug tests; despite knowing how important it was to the case, the court said, Mother had failed to complete those tasks. All of this led the court to conclude that Mother's behavior was unlikely to change going forward.

11

Finally, the court determined that it was in the children's best interests to terminate Mother's parental rights. The court didn't make any further explanation; instead, after orally reciting the reasons that Mother was unfit and why that was unlikely to change for the foreseeable future, the court said that it had considered the physical, mental, and emotion health of the children and had concluded that termination of Mother's rights was in their best interests.

Mother has appealed to this court the district court's order terminating her parental rights to K.H., Z.H., and L.H.

ANALYSIS

We begin with the legal standards that guide our review. To terminate parental rights, the district court must make three findings: (1) that the parent is unfit; (2) that the conduct or condition making the parent unfit is unlikely to change in the foreseeable future; and (3) that termination of parental rights is in the best interests of the child. K.S.A. 2019 Supp. 38-2269(a), (g)(1).

The first two are factual determinations that must be supported by clear and convincing evidence. On appeal, we must determine whether the evidence, taken in the light most favorable to the State (since the fact-finder, the district court, found in its favor), provided clear and convincing support for the district court's factual findings. The test is whether a rational fact-finder could have found the facts highly probable based on the evidence. *In re Adoption of C.L.*, 308 Kan. 1268, 1278-79, 427 P.3d 951 (2018).

The third determination—that the termination of parental rights is in the child's best interests—is a discretionary judgment call. On appeal, we review that determination for abuse of discretion. A district court abuses its discretion when no reasonable person

12

would agree with its decision or when the decision is based on a legal or factual error. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

*The district court's finding that Mother was presently unfit is supported by clear and convincing evidence, as is its finding that Mother's unfitness is unlikely to change in the foreseeable future.*

Mother's first argument on appeal is that there was not clear and convincing evidence to support the district court's finding that she was unfit and that her unfitness was unlikely to change in the foreseeable future. The district court must base its finding that a parent is unfit on one of several statutory bases outlined by the Legislature. See K.S.A. 2019 Supp. 38-2269. And—if supported by clear and convincing evidence—a single such basis can be enough to terminate a parent's rights. K.S.A. 2019 Supp. 38-2269(f).

Here, the district court relied on five of these statutory factors: (1) that Mother had shown a lack of effort to adjust her circumstances, conduct, and condition to meet the children's needs, K.S.A. 2019 Supp. 38-2269(b)(8); (2) that reasonable efforts by public and private agencies to get the family back together had failed, K.S.A.2019 Supp. 38-2269(b)(7); (3) that Mother had failed to carry out a reasonable, court-approved plan directed toward reintegrating the children into her home, K.S.A.2019 Supp. 38-2269(c)(3); (4) that Mother's use of narcotics rendered her unable to care for her children. K.S.A. 2019 Supp. 38-2269(b)(3); and (5) that Mother's mental illness rendered her unable to care for her children, K.S.A. 2019 Supp. 38-2269(b)(1).

Mother contends that it was improper for the district court to rely on the fifth factor because the State had not alleged that Mother's mental illness made her unfit in its motion to terminate parental rights. Because of that, Mother says, she was not on notice that her mental health might form a basis for finding her unfit, so she could not

13

meaningfully respond to that allegation. Mother argues that lack of notice amounted to a due-process violation.

The State contends that Mother's due-process argument is not properly before this court because Mother has raised it for the first time on appeal. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). The State cites our Supreme Court's decision in *Godfrey*, which held that a party must invoke an exception to the general rule about raising issues for the first time on appeal and explain why the issue is properly before the appellate court. 301 Kan. at 1043. Since Mother has failed to explain why her due-process claim is before this court, the State says that she has abandoned the issue.

But we may review claims of constitutional error for the first time on appeal when that's required to serve the ends of justice or to prevent the denial of a party's fundamental rights. *State v. Bowen*, 299 Kan. 339, 354, 323 P.3d 853 (2014). Mother's fundamental rights are implicated here—a parent's right to the control, custody, and care of children is a fundamental right protected by the United States Constitution. *Frazier v. Goudschaal*, 296 Kan. 730, 752-53, 295 P.3d 542 (2013). So we will consider the merits of her argument.

Because parental control is a fundamental right, due-process protections apply to a termination proceeding. *Matter of Ellison*, 305 Kan. 519, 526, 385 P.3d 15, (2016); *In re X.D.*, 51 Kan. App. 2d 71, 73-74, 340 P.3d 1230, (2014). The essence of due process is notice and the right to be heard at a meaningful time and in a meaningful manner. *Alliance Mortg. Co. v. Pastine*, 281 Kan. 1266, 1275, 136 P.3d 457 (2006); *Matter of Estate of Herrman*, No. 118,731, 2018 WL 4262634, at *2 (Kan. App. 2018) (unpublished opinion). Here, the State had not raised the issue, and the court did not raise it until after both parties had presented their evidence. Under those circumstances, Mother could not have meaningfully addressed the court's finding because she did not have notice that mental illness might support terminating her parental rights. We

therefore agree with Mother that the district court should not have raised this statutory factor on its own accord; we will not consider the fifth factor (whether Mother's mental illness rendered her unfit) when determining whether to uphold the district court's decision.

The State suggests that we could summarily affirm the district court based on Mother's failure to adequately brief any complaint about the district court's reliance on the first factor (Mother's lack of effort to adjust to the children's needs). The State may be right about that; Mother has at least failed to address that factor explicitly. But that factor is closely related to the third factor we listed (Mother's failure to carry out a reasonable, court-approved reintegration plan). Given the importance of the issues at stake here, we will address Mother's appeal on its merits, not find in the State's favor because Mother's appellate brief was imperfect.

We turn, then, to the evidence supporting the remaining four factors—(1) that Mother had shown a lack of effort to adjust to the children's needs; (2) that reasonable efforts by public and private agencies to get the family back together had failed; (3) that Mother had failed to carry out a court-approved reintegration plan; and (4) that Mother's use of narcotics rendered her unable to care for her children.

We agree with Mother that there is not clear and convincing evidence that her drug use rendered her unable to care for her children. It is clear from the record before us that Mother used drugs—she admits as much in her brief, though she calls her drug use "sporadic." But the statute requires that drug use "render the parent unable to care for the ongoing physical, mental or emotional needs of the child" before the drug use may be a basis for terminating parental rights—so there must be some connection between the drug use and the child's wellbeing. K.S.A. 2019 Supp. 38-2269(b)(3); see *In re L.C.W.*, 42 Kan. App. 2d 293, 301, 211 P.3d 829 (2009) ("'Just because parents use drugs, or have been convicted of using drugs, or drink too much alcohol, does not automatically mean

15

the child is likely to sustain harm, or the home is contrary to the child's welfare. If that were the test, then thousands of children would be removed from the home weekly.'"). Here, the State has detailed Mother's drug use, but it has not connected the drug use to Mother's inability to meet her children's needs. As a result, this statutory factor is not supported by the evidence.

Even so, we find that clear and convincing evidence supports the other three statutory factors. Testimony at trial showed that Mother had repeatedly failed to carry out significant parts of the court-approved reintegration plan for nearly three years. Despite Mother's struggles to parent her special-needs children, testimony showed that Mother had refused to sign up for in-home family therapy, as a clinician had recommended. As the reintegration plan required, Mother got a substance-abuse and mental-health evaluation, but Mother did not follow through with those recommendations, only sporadically seeking treatment as the termination proceedings drew near. Mother was also consistently late for her weekly, hour-long visitations with her children, often missing up to half of the visit, and was not fostering her relationship with her children; McCarroll testified that this inconsistency was especially concerning because it suggested that Mother would struggle to get her special-needs children to therapy, treatment, and doctor's appointments. McCarroll also described her own efforts on the case as having been above and beyond what a typical case required. Finally, Mother herself testified that she did not think she needed to change her conduct.

We understand that Mother may have a very different view of the facts of the case, but this court must take the evidence in the light most favorable to the State. We also may not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. See *In re Adoption of C.L.*, 308 Kan. at 1279. Under those standards, clear and convincing evidence supports the district court's unfitness finding based on the remaining three factors (Mother's lack of effort to adjust her circumstances to the children's needs,

16

Mother's failure to carry out the reintegration plan, and the failure of reasonable agency efforts aimed at reintegration).

Clear and convincing evidence also supports the district court's finding that Mother's unfitness was unlikely to change in the foreseeable future. We measure the foreseeable future from the children's perspective, as a child's time perspective differs from an adult's. *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014). Here, by the time the district court terminated Mother's parental rights, the boys had been in State custody for nearly three years. Although it's true that Mother and the boys' father initially made progress, the evidence shows that during the two years after Father's death, Mother made little progress towards reintegration. Even in the two months between the two days of trial, Mother did not make progress on tasks that caseworkers viewed as critical. The district court properly determined that Mother's unfitness was unlikely to change in the foreseeable future.

*The district court did not abuse its discretion when it determined that the children's best interests supported termination of Mother's parental rights.*

Mother's final argument on appeal is that in determining whether the termination of parental rights was in the children's best interests, the district court erred by not allowing additional time for Mother to comply with court orders. Because the children were in a stable foster placement for at least four more months, Mother says that the court should have waited to terminate her rights.

Of course, the district court knew this information. It had to decide whether terminating Mother's parental rights was in the boys' best interest. K.S.A. 2019 Supp. 38-2269(g)(1). In doing so, the court must give primary consideration to the physical, mental, and emotional health of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

On appeal, our role is a limited one. The court that hears the evidence directly—the district court—is in the best position to decide whether terminating parental rights is in a child's best interests. Accordingly, we may overturn its decision only for an abuse of discretion. See *Smith*, 306 Kan. at 60.

We find no abuse of discretion here. The children had waited three years to be reintegrated with Mother, yet Mother had not made significant progress toward that goal even as the termination trial was held. Mother failed to recognize that she needed to change her conduct, did not foster the relationship with her children, refused to do family therapy until right before the trial (when it was not available), and, despite many opportunities to do so, did not follow through with substance-abuse and mental-health treatment as the family case plan required. So a reasonable person could agree with the district court's decision that terminating Mother's parental rights was in the boys' best interests.

In closing, comments this court has made in another case are equally true here:

> "Cases like this are difficult ones. A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time. . . . The district court's decision was squarely supported by the evidence. It is time to allow [the child] to move on with her life." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

We affirm the district court's judgment.